Richard Hudson SHARE et al.,
Plaintiffs-Appellants,

v.

AIR PROPERTIES G. INC. et al.,
Defendants-Appellees.

No. 74–3282.

United States Court of Appeals,
Ninth Circuit.

July 6, 1976.

Richard A. DeSantis (argued), Los Angeles, Cal., for plaintiffs-appellants.

Sandra J. Shapiro (argued), of Bancroft, Avery & McAlister, San Francisco, Cal., and Burton S. Levinson (argued), of Levinson, Rove & Lieberman, Beverly Hills, Cal. and Richard A. Fink (argued), of O'Melveny & Meyers, Los Angeles, Cal., for defendants-appellees.

## OPINION

Before GOODWIN and SNEED, Circuit Judges, and EAST,* District Judge.

SNEED, Circuit Judge:

This case comes before us as an appeal from an order of the district court revoking its tentative class certification. The underlying action is brought by investors in a land development project for violations of various securities and related statutes. Appellants claim jurisdiction for this review under 28 U.S.C. § 1291. There is no jurisdiction to review and therefore we dismiss the appeal.

I. *The Facts.*

Plaintiffs-appellants are investors who acquired undivided interests in parcels of real property which were to be developed into an "Airpark" in the vicinity of Paso Robles Airport. The defendants are the individuals and corporations promoting or otherwise involved with the "Airpark" project. Investors paid 40% of the purchase price of their undivided shares as a cash down payment. A promissory note and deed of trust were executed for the balance. The notes were at the rate of 8% per annum. For the first five years repayment was to be monthly and was to include only interest. For the next ten years monthly payments were to include both principal and interest. The total purchase price paid was about $3,406,000. The deeds of trust securing the balance owed by the investors were subordinate to the deeds of trust executed between the promoters and the original holders of the real estate.

In order to market the undivided interests the promoters made representations in a number of publications concerning the project. In September, 1971, defendant Curran, who was apparently the chief promoter of the project, admitted his insolvency. The project appears to have collapsed at that point. On September 30, 1971, plaintiffs commenced this action based upon alleged violations of section 5 of the Securities Act of 1933, 15 U.S.C. § 77e (failure to comply with registration and prospectus requirement), section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, thereunder. In addition, plaintiffs allege counts under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1703, 1705, 1707, the California Corporate Securities Act, Cal. Corp. C. § 25,500 et seq., the California Real Estate Act, Cal. Bus. & Prof. C. § 11,000 et seq., the California Subdivision Map Act, Cal. Bus. & Prof. C. § 11,535 et seq., and counts of common law fraud and conspiracy to defraud.

On May 17, 1972, the district court conditionally granted plaintiffs' motion to maintain the action as a class action. There were some 300 investors who were potential class members. The district court issued an order denying class action status on August

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

20, 1974. It is this order which is on appeal here.

## II. *The Issue.*

The question we face is whether the denial of class status in the circumstances of this case may be the basis of an immediate appeal as of right. The parties, following the recent case law, have centered their argument around the so-called "death knell" doctrine of the Second Circuit and, in particular, around the notion of the viability of the named plaintiffs' individual causes of action. *See, e. g., Korn v. Franchard Corp.*, 443 F.2d 1301 (2d Cir. 1971). We believe that this focus is too narrow. Both the "death knell" doctrine and its ancestor, the collateral order doctrine, are applicable to a denial of class status. Moreover, it is our view that the theoretical bases for collateral order and "death knell" appeals have not been properly articulated and are often confused. Hence, we first will set forth our understanding of the "death knell" and "collateral order" doctrines before applying them to the facts of this case.

## III. *The "Death Knell."*

The confusion began, albeit unrecognized, when the "death knell" doctrine was first enunciated. *See Eisen v. Carlisle & Jacquelin*, 370 F.2d 119 (2d Cir. 1966), *cert. denied*, 386 U.S. 1035, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967) (*Eisen I*). The Second Circuit framed the issue in *Eisen I* as the question of whether the facts there fell within the collateral order doctrine. *Id.* at 120. Next the court invoked *Gillespie v. United States*, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), for the proposition that finality is to be given a "practical rather than a technical construction." That court concluded that an appeal would lie in a case where denying an appeal would mean the end of the lawsuit "for all practical purposes." *Eisen I*, at 120. The structure of the argument in *Eisen I* made the "death knell" rule appear to be merely a special case of the collateral order doctrine. Some courts continue to discuss the two as if they were interchangeable. *See, e. g., City of New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295 (2nd Cir. 1969). Other courts have rejected the "death knell" approach without articulating a distinction between the two rules.[1] It is our view that the collateral order doctrine and the death knell rule represent two distinct but compatible tests for appealability.[2]

---

1. The leading case rejecting the death knell doctrine is *Hackett v. General Host Corp.*, 455 F.2d 618 (3d Cir.), *cert. denied*, 407 U.S. 925, 92 S.Ct. 2460, 32 L.Ed.2d 812 (1972). *See also, King v. Kansas City Southern Industries, Inc.*, 479 F.2d 1259 (7th Cir. 1973); *Gerstle v. Continental Airlines, Inc.*, 466 F.2d 1374 (10th Cir. 1972). *Hackett* correctly states that the "death knell" rule "will operate primarily if not exclusively in that class of cases in which attorneys are willing to undertake on a contingent fee basis class actions for the recovery of money damages for claimed violations of federal regulatory statutes. These are chiefly the federal antitrust and securities statutes." *Id.* at 623. The *Hackett* court goes on to say that the primary justification for the "death knell" rule is that, by being hospitable to the purported class, it tends "to reenforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement." We disagree. As we state in text, *infra,* the reasons for allowing review in such cases are very much closer to the core of the federal judicial system than any fashionable notion about the usefulness of the class action as a social weapon. It is our view that to deny review in such cases removes from plaintiff his day in court on the merits with too high a probability of error. Nor does certification under 28 U.S.C. § 1292(b) or mandamus solve the problem, as *Hackett* suggests. The very error with which we are concerned is that of the district judge, and it is precisely in those cases where he fails to certify under § 1292(b) where the harm will be manifest. For those cases in which there has been error and no section 1292(b) certification, mandamus, as traditionally formulated, imposes too high a standard to give adequate protection to plaintiffs.

2. We feel that our view was foreshadowed by *Weingartner v. Union Oil*, 431 F.2d 26 (9th Cir. 1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 459, 27 L.Ed.2d 451 (1971), the first case in this Circuit dealing with the death knell. In that case the collateral order rule *or* the likelihood of irreparable harm to a party were considered alternative justifications for immediate review. *Id.* at 29.

■ The collateral order doctrine provides appellate jurisdiction with respect to asserted rights which do not constitute an ingredient of the basic cause of action and which will be lost forever if the disposition of the trial court is not reviewed on appeal prior to the adjudication of the basic cause. The death knell doctrine, on the other hand, is concerned with survival of the basic cause of action, not merely a right collateral thereto, and is grounded on the notion that a sentence of death should not be passed on a cause of action by only one judge. Its foundation is that each litigant deserves not only his day in district court but also his day on appeal. Congress set up the federal judiciary so that litigants are allowed at least "two bites at the apple" before they are foreclosed on the merits—one before a trial court and another before a court of appeals. Presumably this was felt to be the proper balance between achieving finality on the one hand and reducing the probability of error in the individual case on the other. We see no reason why the balance should be differently drawn in the case of a class certification where the individual claims are not viable. This is so even though by the usual criteria the order may be otherwise inappropriate for review. Nonetheless, it is our view that justice demands that we compromise our usual no-

tions of appropriateness for review to avoid the execution of a cause of action on the basis of a decision of a single district judge.[3]

■ Our compromise should be no broader than necessary to serve its purpose. Thus, we believe that courts must be strict in making the plaintiff demonstrate that the order complained of truly means the death of his action. We agree with the Fifth Circuit that the size of the individual claims, the extent of plaintiffs' resources, and the probable expense of prosecuting the lawsuit are all factors relevant to the issue of viability. *Graci v. United States*, 472 F.2d 124 (5th Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). We also agree that in those cases where the amount in controversy leaves the question of viability in doubt, the plaintiff bears the burden of showing that death to the action would result from the failure to certify the class. *Gosa v. Securities Investment Co.*, 449 F.2d 1330 (5th Cir. 1971).

■ There has been confusion over the proper measure of the amount in controversy for the purpose of determining the viability of the action. Plaintiffs here have argued that the proper measure is the "average" claim, the "typical" claim,[4] or the claims of the representative plaintiffs. This is incorrect. If *any* member[5] of the

---

3. Our view does not conflict with the result in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975). *Blackie* rejected the reverse death knell doctrine in this Circuit. *Id.* at 895–900. We agree. The irreparable harm which justifies the death knell doctrine is the possibility of foreclosing a plaintiff without review. This is a concern which is an integral part of the congressional scheme for the federal judicial system. A grant of class certification does not threaten that harm, but only a loss of money. Thus the death knell doctrine does not apply, but this does not mean that a class certification might not in some cases qualify for appeal under the collateral order doctrine. This was not the case in *Blackie* since the question of certification went to the merits of the case.

We reject the three-pronged test, which appears to be the latest formula of the Second Circuit for solving these problems. *See, e. g., Parkinson v. April Industries*, 520 F.2d 650 (2nd Cir. 1975). The test requires that: (1) the class action determination be "fundamental to the further conduct of the case"; (2) review of the

order be "separable from the merits"; (3) the order cause irreparable harm including the time and money spent in defending a huge class action. Loss of litigation expenses does not qualify a case for death knell treatment. Nor should there be a requirement that an order be "fundamental," in the sense of being essential to the survival of the action, in order to qualify as a collateral order.

4. We find no need to characterize plaintiffs' argument in the more precise language of mean, median, and mode. As the ensuing text makes clear, each of these measures is conceptually incorrect in this context.

5. It is also true, of course, that if any group of two or more class members go forward the right of appeal is preserved. In certain circumstances it might be appropriate to determine viability by aggregating the claims of a group of class members. *See Weingartner v. Union Oil Co.*, 431 F.2d 26, 29 (9th Cir. 1970), *cert. denied*, 400 U.S. 1000, 91 S.Ct. 459, 27 L.Ed.2d

purported class proceeds in an individual action, the class certification can be challenged on appeal by other members of the class, named or unnamed. *See Monarch Asphalt Sales Co. v. Wilshire Oil Co.*, 511 F.2d 1073 (10th Cir. 1975).

■ Therefore, we hold that, if after appropriate proceedings and findings with respect to whether any member of the purported class possesses a cause of action which is viable if brought individually, it appears such a member exists, an order of the trial court denying class certification does not constitute an appealable order.[6] It is simply not true, as plaintiffs here claim, that the successful plaintiff in an individual action would have no incentive to challenge a denial of class status. Presumably, a reversal of the denial would lead to a greater recovery and hence lower the proportion of plaintiff's individual recovery going to his attorney. Such a challenge has in fact been mounted. *See Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969).

■ We believe the "death knell" has not rung in this action. The record reveals that among the class members actively engaged in this litigation there is one individual who

purchased his undivided share for $44,-752.50. Even if we accept the contention that the amount in controversy is only 40% of this[7]—the cash down payment—the claim is still for $17,901. This falls in the clearly viable range. *See Gosa v. Securities Investment Co., supra.*[8] These figures ignore, in addition to the amount of the note, any claim for interest paid on the notes or for punitive damages. Hence, even when an extremely conservative measure is used, this action is viable.[9] In addition, the record indicates there exist other purchasers of undivided interests having even larger claims.[10]

## IV. *The Collateral Order Doctrine.*

■ Unlike the "death knell" doctrine the collateral order doctrine, properly understood, requires no compromise of the principles of appellate review. *See Cohen v. Beneficial Loans Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). In fact the preconditions the doctrine requires define a type of final order precisely ripe for appellate review. In the words of *Cohen*, the collateral order doctrine grants review "in that small class [of cases] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and

451 (1971). We have no occasion in the context of this case to decide this point. *See* note 8 *infra.*

6. We reject the argument that so long as any individual claim is not viable the death knell has rung. *See City of New York v. International Pipe & Ceramics Corp.*, 410 F.2d 295, 301 (2nd Cir. 1969) (Hays, J., dissenting). So long as the issue of the refusal of certification may be challenged on appeal the rights of all small claimants are protected to the same extent they would be in any other action. Whether the refusal by a class member having a viable individual claim to pursue his individual remedy or the relinquishment of his claim, as a result of a settlement or otherwise, constitutes a basis to justify a reexamination of the issue of appealability of a denial of class certification is not before us and we express no opinion thereon.

7. There is a controversy between the parties over whether the amount in controversy is to be measured by the purchase price of the undivided interests in land which were sold or by the cash down payment only. We think that

the full purchase price measures the amount in controversy. Plaintiffs not only paid cash down payments but also executed notes for the balance. Certainly rescission of those notes is an integral part of the relief they seek. Counts one and two of plaintiffs' Second Amended Complaint request such relief. However, we do not rely on this point in reaching our decision.

8. The record also reveals two individuals who evidently purchased their shares jointly for a price of $67,128.75. Forty percent of this figure is $26,851.50. *See* note 5 *supra.*

9. We in no way mean to indicate that such a conservative measure is the most appropriate one in every case. We use it only to underscore our result and to eliminate the necessity to devise a formula for the amount of a claim in a land sale case.

10. These "other purchasers" are different from the two referred to in note 8, *supra.*

too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546, 69 S.Ct. at 1225, 93 L.Ed. at 1536. The essence of the doctrine is that there is no reason not to review since as to the aspect of the case in question the proceedings are final. In addition, there is a strong reason to grant review because at least one party will suffer irreparable harm if the order is erroneous.[11]

██ In a sense the determination of class status is collateral to the merits of the case. However, frequently the issues upon which class certification turns are not separable from the merits. The order of the trial court makes it clear that this is such a case. The trial court's order turned upon an application of the federal securities law of this circuit to the facts of the case. In particular, the denial turned on the application to this case of *Esplin v. Hirschi*, 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969) and *White v. Abrams*, 495 F.2d 724 (9th Cir. 1974). The issue of defendant's duty is at the very heart of the merits of the action as well as being at the heart of the predominance question under Rule 23(b)(3).

Nonetheless, a denial of class certification, even though not a collateral order, under proper circumstances may constitute an appealable order under 28 U.S.C. § 1291. To the extent indicated herein we recognize the "death knell" doctrine in spite of its failure to fit neatly within the collateral order doctrine. In this case the requirements of the "death knell" doctrine were not met.

APPEAL DISMISSED.

---

11. Thus, doctrinally the death knell and collateral order doctrines are distinct. They are related, however, in one functional sense. Both are concerned with the question of whether the issue upon which the contested order turns will be litigated again if review is not granted.